# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP2435-D |

| | |
|---|---|
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Michael M. Krill, Attorney at Law: |

Office of Lawyer Regulation,
      Complainant,
   v.
Michael M. Krill,
      Respondent.

DISCIPLINARY PROCEEDINGS AGAINST KRILL

| | |
|---|---|
| OPINION FILED: | February 20, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|    COURT: | |
|    COUNTY: | |
|    JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
| NOT PARTICIPATING: | |

| | |
|---|---|
| ATTORNEYS: | |

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP2435-D

STATE OF WISCONSIN : IN SUPREME COURT

In the Matter of Disciplinary Proceedings
Against Michael M. Krill, Attorney at Law:

Office of Lawyer Regulation,

        Complainant,

   v.

Michael M. Krill,

        Respondent.

**FILED**

**FEB 20, 2020**

Sheila T. Reiff
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. This case is before us pursuant to Supreme Court Rule (SCR) 22.14(2) and SCR 22.17(2) on a stipulation between the parties, Attorney Michael M. Krill and the Office of Lawyer Regulation (OLR). In the stipulation, Attorney Krill pled no contest to 24 counts of misconduct as alleged in the OLR's third amended complaint. The referee issued a report recommending, consistent with the stipulation, that the court suspend Attorney Krill's license to practice law for three years, retroactive to August 23, 2017, order Attorney Krill to pay restitution to two

clients, make satisfaction of a judgment as a condition of any future reinstatement, and order Attorney Krill to pay the full costs of this proceeding, which total $21,247.90 as of October 23, 2019.

¶2 We approve the referee's recommendations with respect to the stipulated findings of fact and conclusions of law and we adopt those findings and conclusions. We determine that a three-year suspension is insufficient given the extremely serious nature of the misconduct. We suspend Attorney Krill's license to practice law for four and one-half years, retroactive to August 23, 2017. We agree with the other recommended sanctions.

¶3 Attorney Krill was admitted to practice law in Wisconsin in 1991. He practiced in Milwaukee and, until this matter, had not been the subject of professional discipline. This court temporarily suspended Attorney Krill's law license on August 23, 2017, pursuant to SCR 22.21, on the grounds that his continued practice of law posed a risk to the public and to the administration of justice. OLR v. Krill, No. 2017XX955, unpublished order (S. Ct. August 23, 2017). His law license remains suspended. The reasons for the temporary suspension are reflected in this opinion, namely, Attorney Krill was implicated in a financial scam conducted by one of his clients.

¶4 On December 14, 2017, the OLR filed a disciplinary complaint against Attorney Krill. Initially, the OLR sought revocation of Attorney Krill's law license. The complaint was amended several times; the third and final amended complaint was filed September 5, 2019. It contains some 166 separately numbered

2

paragraphs describing 24 counts of misconduct in connection with Attorney Krill's representation of several clients. In the amended complaint the OLR sought a three-year suspension.

¶5 Shortly before the scheduled three-day evidentiary hearing, Attorney Krill and the OLR entered into a stipulation in which Attorney Krill pled no contest to all the allegations of misconduct, and the parties also agreed on the sanctions they considered appropriate.

¶6 The referee, Jonathan V. Goodman, reviewed the stipulation and accepted the factual allegations of the third amended complaint as his findings of fact. Based on those facts, the referee concluded that Attorney Krill had engaged in 24 separate acts of professional misconduct. Given the extensive nature of the allegations set forth in the stipulation and accepted by the referee, we provide a summary of each client matter, followed by summary information concerning Attorney Krill's misconduct.

**AMSAH, LLC Matter** (Counts 1-8)

¶7 In October 2014, Attorney Krill was hired to represent S.A. and Z.H. and their business, AMSAH, LLC. Attorney Krill represented these parties in two Racine County cases, each a dispute over the entitlement to insurance proceeds received from the settlement of a lawsuit.

¶8 In January 2015, $75,000 in settlement proceeds was deposited in Attorney Krill's IOLTA trust account. By the end of March 2015, Attorney Krill had disbursed all the funds without court or client authorization, and without accounting to the

3

clients for his disbursement of the funds. In November 2016, $226,412.41 in settlement proceeds was deposited in Attorney Krill's trust account. By February 15, 2017, Attorney Krill had disbursed all the funds without court or client authorization and without accounting to the clients for his disbursement of the funds.

¶9 By the end of 2016, due to a conflict, Attorney Krill ceased representing S.A. and Z.H., but continued as counsel for AMSAH. In February 2017, the circuit court ordered Attorney Krill to provide an accounting of the $301,412.41 he was supposed to be holding in trust. In March 2017, the circuit court ordered Attorney Krill to transfer these funds from his trust account to the trust account of Z.H.'s successor counsel.

¶10 Attorney Krill failed to comply with any of the court's orders and was held in contempt. The circuit court ordered that Attorney Krill could purge the contempt by delivering the proceeds and providing a full accounting. In May 2017, Attorney Krill told the circuit court that he had "invested" the settlement money in bonds. Attorney Krill was not authorized to do this. Moreover, this representation was untrue. In fact, Attorney Krill had transferred the funds from his trust account to banks in the United Kingdom and China, and had issued thousands of dollars in checks drawn on the trust account, payable to himself.

¶11 At a status conference in August 2017, Attorney Krill promised the circuit court that he would deliver the proceeds "within two weeks." The circuit court issued an order providing that if the proceeds were not repaid within two weeks, the circuit

4

court would order Attorney Krill to be jailed as a contempt sanction.

¶12  On September 6, 2017, the circuit court entered judgment against Attorney Krill in the sum of $301,412.41.  City of Racine v. AMSAH, LLC, Racine County Circuit Court, case no. 2015CV1289. Attorney Krill did not deliver the proceeds by the circuit court imposed deadline and, on September 14, 2017, the circuit court ordered Attorney Krill jailed.  On September 26, 2017, the circuit court ordered judgment against Attorney Krill in the sum of $48,000 as the accumulated contempt sanction for his failure to return the proceeds as ordered by the circuit court.

¶13  Meanwhile, by March 2017, S.A. had filed a grievance against Attorney Krill and the OLR asked Attorney Krill to provide information related to the AMSAH matters.  Attorney Krill did not timely cooperate, failed to provide requested file materials, failed to provide business and trust account records, and still has not provided an accounting of the AMSAH proceeds.

**R.G. Matter** (Counts 9-11)

¶14  In 2013, Attorney Krill was retained to represent Eric Murray ("Murray").  Many of the remaining allegations of misconduct relate to an "advance fee scheme" conducted by Murray.[1]  The complaint alleges that Attorney Krill provided services to Murray

---

[1] An advance fee scheme occurs when the victim pays money to someone in anticipation of receiving something of greater value – such as a loan, contract, investment of a gift – then receives little or nothing in return.  See https://www.fbi.gov/scams-and-safety/common-fraud-schemes/advance-fee-schemes.

in connection with this scheme, with reckless disregard for whether Murray's transactions were fraudulent.

¶15  In September 2015, Murray offered R.G. an "investment opportunity" and provided R.G. with a Non-Disclosure Agreement ("NDA") form that Attorney Krill had prepared for Murray.  Attorney Krill then made changes to a draft agreement between Murray and R.G.  The parties agreed and the documents provided that R.G. would loan Murray $17,500 "to immediately close-out [a] Private Banking Transaction."  In exchange, Murray would pay R.G. $72,000 within 14 days after execution of the agreement.  R.G. was to wire the funds to Attorney Krill's trust account, then Attorney Krill would wire the funds to Murray's representative in England.  Murray promised to deliver copies of various documents that would substantiate the transaction.  The NDA prohibited R.G. from contacting any of the institutions or related parties to determine the legitimacy of the private banking transaction due to its "sensitive" nature.

¶16  All the documents purporting to substantiate the private banking transaction were forged and fraudulent.  Relying on the forged and fraudulent documents provided to him by Attorney Krill, and the false and fraudulent representations regarding the purported private banking transaction contained in both the NDA and the agreement, R.G. wired $17,500 to Attorney Krill's trust account on September 25, 2015.

¶17  On September 29, 2015, Attorney Krill in turn wired $30,000 from his trust account pursuant to an international wire transfer to Lloyds Bank Plc, London, U.K., for deposit to the

6

account of "Optra Sales and Services." This transaction included R.G.'s funds. Attorney Krill provided no written accounting to R.G. regarding his distribution of R.G.'s funds. To date, R.G. has not been repaid the sum invested or any other monies due him under the agreement.

¶18  In November 2016, the OLR asked Attorney Krill to detail, among other things, the sources of certain documents used in the transaction, to disclose where R.G.'s funds were deposited or held, to disclose the identity of "independent sources" that he told the OLR had confirmed that the funds for the purported private banking transaction were in place, and to explain how he certified that the documents he provided to R.G. were not fraudulent.

¶19  Attorney Krill provided a partial response to the OLR but did not respond to the OLR's questions regarding the location of R.G.'s funds or the identity of the "independent sources" who could confirm various aspects of the transaction. Attorney Krill denied the transaction was fraudulent and provided a letter dated January 26, 2017, purportedly from a London, U.K., solicitor, Harvey Graham ("Graham Letter"), denying that Attorney Krill engaged in any kind of fraudulent transaction. The Graham Letter is printed on what purports to be letterhead stationery of "HARVEY GRAHAM SOLICITORS & CO." in Holborn, London, U.K.

¶20  The OLR determined that the Graham Letter was false and fraudulent. To date, Attorney Krill has not provided an accounting of R.G.'s funds or other details regarding the purported private banking transaction.

7

**D.R. Matters** (Counts 12-17)

¶21 From May 2014 to March 2016, Attorney Krill represented D.R. in several legal matters. In May 2014, Attorney Krill and D.R. discussed whether D.R. might participate in one of Murray's "investment opportunities." Attorney Krill did not disclose to D.R. that his simultaneous representation of them created a concurrent conflict of interest and he neither sought nor obtained written informed consent of each client to the representation.

¶22 In June 2014, Attorney Krill sent D.R. an email stating:

> Please find attached a copy of the Inland Revenue Certificate which requires a payment of $16,500 to release the $10,500,000.00 and a confirmation of the wire. [Murray] has $2,500 to invest in this transaction. He needs $14,000 to complete. For this investment you will be paid $500,000.00. My investment to date is $30,000.00. I have been working on this transaction for two months. Paulinus Blair is the banker in London that [Murray] is working with to get this transaction completed. I just got off the phone with him. Mr. Paulinus confirmed that the $10,500,000.00 wire will be released by Suntrust Bank in the US within 24 hours of receipt of the certificate.

¶23 Attorney Krill then forwarded to D.R. a series of purportedly authentic documents he had received from Murray, including:

- A letter from the "Home Office Inland Revenue Services" dated May 20, 2014 allegedly serving as a "letter of guarantee" for IRS Tax Clearance;
- An undated "Swift Telegraphic Transfer" allegedly showing a transfer of $10,500,000 to Murray.

8

- A certification from a Chinese entity showing indemnity or bonding coverage in the sum of $16,200,000 benefitting Murray's company, Unite2Jam, Inc.;

- A letter from the Bank of China (Hong Kong) to Natwest Bank, requesting payment of $78,400 for release of what was described as a hand over certificate of bond for the benefit of Murray;

- A "Letter of Guarantee" from the Bank of England to the Director of the "Foreign Operations Department" of the Saudi British Bank, seeking the "Final Funds Release Order" documents;

- A Certified Statement Invoice from HM Revenue and Customs; and

- A letter from Harvey Graham to Murray stating that upon receipt of $47,000 we will "immediately proceed to the H.R.M.C. OFFICE to obtain the required F.D.I.C.C. Digital signature and complete the transaction without any further delay."

All these documents were forged and fraudulent. In forwarding the email and documents to D.R., Attorney Krill recklessly disregarded whether the documents were forged and fraudulent.

¶24 Relying on Attorney Krill's representations and the documents Attorney Krill provided him, D.R. gave Attorney Krill $107,000 to invest with Murray, which Attorney Krill deposited in his trust account. These funds were the property of J.A. J.A. had agreed to transfer funds to Attorney Krill based on an understanding that the funds would be retained in Attorney Krill's

9

trust account until J.A. had sufficient funds to purchase a building. Attorney Krill wired the funds from his trust account to foreign banks for deposit in foreign bank accounts within days after their receipt. Attorney Krill provided no accounting.

¶25 In November 2016, the OLR asked Attorney Krill to detail the source of certain documents used in connection with these transactions, the basis for the promises described in the agreements, the identity of every individual who received the funds, and where the funds were deposited or held, along with supporting documentation. Attorney Krill's lawyer sent the OLR a letter stating that Attorney Krill was in litigation with D.R. and that while Attorney Krill sought to cooperate with the OLR, "providing information to your office places Krill at a disadvantage in the civil lawsuit." The letter contained no substantive response and included no documentation. Attorney Krill has not responded to the OLR's requests for information regarding this matter, and has not provided an accounting of the funds or other details regarding the transactions.

¶26 Meanwhile, in 2013, a judgment of foreclosure and sale was entered against a Milwaukee condominium owned by Attorney Krill. D.R. and Attorney Krill entered into an oral agreement whereby D.R. agreed to serve as a "straw man" on Attorney Krill's behalf and to purchase the condominium at the sheriff sale. In return, Attorney Krill agreed to stay in the condominium, pay property taxes, and the parties would renegotiate ownership of the property at a later date.

¶27  Attorney Krill did not prepare a writing enumerating the details of the straw man transaction with D.R.  D.R. performed the agreement and purchased the property at the sheriff's sale.  On February 3, 2014, the court confirmed the sale.

¶28  D.R. later asserted that Attorney Krill promised D.R. that he could keep Attorney Krill's condominium if Murray failed to repay monies advanced by his entities.  In November 2016, D.R. sued Attorney Krill in Milwaukee County Circuit Court over the ownership of the condominium.

¶29  In December 2017, the OLR asked Attorney Krill to provide copies of documents associated with the condominium transaction as well as details regarding the money provided to Attorney Krill as part of the Murray transaction.  Attorney Krill's lawyer sent the OLR a letter stating that Attorney Krill was in litigation with D.R. and that while Attorney Krill sought to cooperate with the OLR, "providing information to your office places Krill at a disadvantage in the civil lawsuit."  The letter contained no substantive response and included no documentation.

**J.S. Matter** (Counts 18-20)

¶30  J.S. sought financing to launch a new business venture. In late April or early May 2015, Attorney Krill and J.S. discussed J.S.'s involvement in one of Murray's "investment opportunities." J.S. loaned $5,400 to Murray.  Attorney Krill agreed to guaranty the return of the loan by executing a promissory note payable to J.S.

¶31  In May 2015, consistent with the "agreement," J.S. wired $5,400 to Attorney Krill's trust account in consideration of

11

Attorney Krill executing a promissory note payable in 30 days to J.S. for $5,400 principal and $5,400 interest. The note stated that "proceeds from this loan shall be used to finalize the release of funding from Echo Bank, South Africa in the amount of $1,800,000.00." The note also stated that "[a]s additional consideration for this loan [J.S.] shall be entitled to a payment of $300,000.00 from said tranche of funds which will be incorporated into a total equity investment" in J.S.'s business venture for which she sought financing. In May 2015, Attorney Krill issued a check payable to himself from the trust account in the sum of $5,800.

¶32 The statements in the promissory note regarding the "release" of funding from Echo Bank in South Africa and the purported deposit of "$16.2 million" at the Federal Reserve were false and fraudulent. Attorney Krill recklessly disregarded whether the transactions described were false and fraudulent.

¶33 In November 2016, the OLR asked Attorney Krill to respond to J.S.'s grievance. Attorney Krill responded, but failed to provide requested information and denied the transaction was fraudulent. He attached a letter purportedly from the London, U.K., solicitor, Harvey Graham, denying that Attorney Krill engaged in any kind of fraudulent transaction. The OLR determined that the Graham Letter was false and fraudulent. Attorney Krill has neither repaid J.S. nor provided an accounting.

**L.P. Matter (Count 21)**

¶34 In response to an inquiry from the OLR, L.P. told the OLR that Attorney Krill had solicited him to participate in one of

12

Murray's "investment opportunities." In May 2015, L.P. gave Attorney Krill $25,000. Attorney Krill deposited the funds into his trust account and used the funds to wire transfer $24,600 to an account in the United Kingdom. The OLR asked Attorney Krill to detail the various aspects of the transactions. Attorney Krill received several extensions of time but did not respond to the OLR.

**J.A. Matter** (Counts 22-24)

¶35 In November 2014, a fire destroyed commercial property owned by J.A. With the assistance of D.R. (whose interactions with Attorney Krill were discussed supra at ¶¶21-29), J.A. submitted an insurance claim. The parties settled and the insurer issued a check in the sum of $235,721.32 payable to J.A. The check was endorsed and D.R. deposited the check into a business account pending purchase of new property.

¶36 J.A. then retained Attorney Krill for assistance with a second insurance claim. After the insurance proceeds described above had been deposited, D.R. told J.A. that Attorney Krill should hold certain of J.A.'s funds in trust until J.A. found another property to purchase. During the summer of 2015, D.R. transferred $107,000 of J.A.'s money into Attorney Krill's trust account for purposes of investing the funds with one of Murray's "investment opportunities."

¶37 In January 2016, Attorney Krill prepared an agreement pursuant to which J.A. agreed to loan funds for a "Private Banking"

13

transaction.[2] Pursuant to the agreement, J.A. was to be repaid $235,721 within 30 days after release of the funds from the private banking transaction and was to receive $500,000 within 60 days of the release of the funds from the private banking transaction. J.A. has not received either the entire $235,721 or the $500,000 investment funds that was to be paid under the agreement.

¶38 In September 2017, J.A. filed a grievance against Attorney Krill with the OLR. The OLR asked Attorney Krill to detail the various aspects of the transactions and to identify the transfers of funds made by D.R. Attorney Krill requested follow-up information and sought several extensions of time, but never provided the requested information and has not provided J.A. any accounting for the use of the funds deposited in Attorney Krill's trust account.[3]

¶39 Attorney Krill's misconduct violated a number of the Rules of Professional Conduct for Attorneys. The stipulation provided and the referee concluded that by failing to hold client

---

[2] The agreement refers to the sum of $147,000, but the OLR could only verify the transfer of $107,000 from accounts controlled by D.R. to Attorney Krill's trust account. Again, these funds belonged to J.A.

[3] On or about October 10, 2017, J.A. filed a claim with the Wisconsin Lawyers' Fund for Client Protection ("Fund") seeking reimbursement from the Fund in the sum of $235,721 for the loss incurred due to Attorney Krill's misconduct in relation to the insurance proceeds. On or about March 27, 2017, the Fund paid J.A. the sum of $147,000.

funds in trust, Attorney Krill violated SCR 20:1.15(b)(1)[4] in the AMSAH matter (Count 1).

¶40  The stipulation provided and the referee concluded that by disbursing proceeds without providing his clients or any other interested party an accounting, Attorney Krill violated former SCR 20:1.15(d)(2)  and/or  SCR 20:1.15(e)(2)[5]  in  the  following client matters:  AMSAH (Count 2), R.G (Count 9), D.R. (Count 13) J.S. (Count 18) and J.A. (Count 22).

---

[4] SCR 20:1.15(b)(1) provides:

A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and 3rd parties that is in the lawyer's possession in connection with a representation.  All funds of clients and 3rd parties paid to a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts.

[5] Effective July 1, 2016, substantial changes were made to Supreme Court Rule 20:1.15, the "trust account rule." See S. Ct. Order 14-07, 2016 WI 21 (issued Apr. 4, 2016, eff. July 1, 2016). Because the conduct underlying this case arose prior to July 1, 2016, unless otherwise indicated, all references to the supreme court rules will be to those in effect prior to July 1, 2016.

Former  SCR  20:1.15(d)(2)  was  renumbered  as SCR 20:1.15(e)(2).  The text of the rule was not changed and provides:

Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing.  Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

¶41 The stipulation provided and the referee concluded that by making cash withdrawals from his trust account, Attorney Krill violated former SCR 20:1.15(j)(3)a. and/or SCR 20:1.15(f)(2)[6] in the AMSAH matter (Counts 3-4).

¶42 The stipulation provided and the referee concluded that by knowingly making false statements of fact to a tribunal regarding his purported investment of client funds proceeds, Attorney Krill violated SCR 20:3.3(a)(1)[7] in the AMSAH matter (Count 5).

¶43 The stipulation provided and the referee concluded that by knowingly disobeying orders of the court, leading to the court holding him in contempt, Attorney Krill violated SCR 20:3.4(c)[8] in the AMSAH matter (Count 6).

---

[6] Former SCR 20:1.15(j)(3)a. was renumbered as SCR 20:1.15(f)(2). The text of the rule was not changed and provides: "No withdrawal of cash shall be made from a trust account or from a deposit to a trust account. No check shall be made payable to 'Cash.' No withdrawal shall be made from a trust account by automated teller or cash dispensing machine."

[7] SCR 20:3.3(a)(1) provides: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

[8] SCR 20:3.4(c) provides: "A lawyer shall not knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists."

¶44 The stipulation provided and the referee concluded that Attorney Krill violated SCR 20:8.4(c)[9] (Misconduct) as follows:

- By disbursing client proceeds without authorization from his clients or the court, thereby converting the proceeds (AMSAH Matter, Count 7);

- By drafting and providing R.G. with the NDA and the agreement while recklessly disregarding whether there was a non-fraudulent "Private Banking" transaction (R.G. Matter, Count 10);

- By representing that various documents were legitimate, while recklessly disregarding whether the documents were in fact false and/or fraudulent (D.R. Matter, Count 14);

- By making the statements to J.S. in the promissory note referencing an investment at Echo Bank, South Africa in the amount of $1,800,000, with a further promise of payment of $300,000, while recklessly disregarding whether the statements were false and/or fraudulent (J.S. Matter, Count 19); and

- By preparing the agreement to ratify the use of J.A's funds for investment with Attorney Krill's client under circumstances where he recklessly disregarded information suggesting that the purported investment opportunity was fraudulent (J.A. Matter, Count 23).

---

[9] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

17

¶45 The stipulation further provided and the referee concluded that by failing to timely respond to the OLR's notice of formal investigation, failing to provide the OLR information responsive to the OLR's inquiries, by unilaterally postponing a scheduled investigative interview, and by providing false and misleading information to the OLR, Attorney Krill violated SCR 22.03(2)[10] and SCR 22.03(6),[11] enforced via SCR 20:8.4(h)[12] in the following matters: AMSAH (Count 8), R.G. (Count 11), D.R.

---

[10] SCR 22.03(2) provides:

> Upon commencing an investigation, the director shall notify the respondent of the matter being investigated unless in the opinion of the director the investigation of the matter requires otherwise. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct within 20 days after being served by ordinary mail a request for a written response. The director may allow additional time to respond. Following receipt of the response, the director may conduct further investigation and may compel the respondent to answer questions, furnish documents, and present any information deemed relevant to the investigation.

[11] SCR 22.03(6) provides: "In the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance."

[12] SCR 20:8.4(h) provides: "It is professional misconduct for a lawyer to fail to cooperate in the investigation of a grievance filed with the office of lawyer regulation as required by SCR 21.15(4), SCR 22.001(9)(b), SCR 22.03(2), SCR 22.03(6), or SCR 22.04(1)."

(Counts 15 and 17), J.S. (Count 20), L.P. (Count 21), and J.A. (Count 24).

¶46 The stipulation provided and the referee concluded that by representing Murray in ways that were directly adverse to J.A. without obtaining the clients' informed consent, Attorney Krill violated SCR 20:1.7(a)(1)[13] (D.R. Matter, Count 12).

¶47 Finally, the stipulation provided and the referee concluded that by entering into a business transaction regarding his condominium with his client D.R., without preparing a writing detailing the terms of the transaction, advising D.R. of the desirability of seeking counsel, and obtaining D.R.'s informed consent in writing, Attorney Krill violated SCR 20:1.8(a)[14] (D.R. Matter, Count 16).

---

[13] SCR 20:1.7(a)(1) provides: "Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if the representation of one client will be directly adverse to another client."

[14] SCR 20:1.8(a) provides:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

19

¶48 Attorney Krill pled no contest to each of the 24 counts of misconduct. The parties' stipulation recites that Attorney Krill understands the allegations of the complaint, that he enters the stipulation freely, knowingly, and voluntarily, and that he understands that he had a right to contest the matters and consult with and be represented by counsel. The parties stipulated that a three-year suspension was appropriate discipline, to be imposed retroactive to the date of Attorney Krill's temporary suspension. The referee agreed, and also recommended restitution and payment of the judgment entered against Attorney Krill in the AMSAH matter as a condition of reinstatement, both as stipulated by the parties, as well as costs.

¶49 No appeal was filed from the referee's report and recommendation, so our review proceeds pursuant to SCR 22.17(2). When reviewing a report and recommendation in an attorney disciplinary proceeding, we affirm a referee's findings of fact unless they are found to be clearly erroneous. In re Disciplinary Proceedings Against Inglimo, 2007 WI 126, ¶5, 305 Wis. 2d 71, 740 N.W.2d 125. We review the referee's conclusions of law on a de novo basis. Id. We determine the appropriate level of discipline given the particular facts of each case, independent of the referee's recommendation, but benefitting from it. In Re

---

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶50 We adopt the findings of fact and conclusions of law to which the parties have stipulated and as adopted by the referee. We now turn to the appropriate sanction for Attorney Krill's misconduct.

¶51 A lengthy suspension is clearly required. Indeed, the OLR initially sought revocation. The parties then stipulated that a three-year suspension would be appropriate, commencing retroactive to August 23, 2017, the date when Attorney Krill's license to practice law was temporarily suspended by this court.

¶52 The referee described this as one of the most serious cases he has seen. The referee acknowledged that entering into the stipulation obviated the need for a three-day evidentiary hearing, but expressed concern that the length of suspension was insufficient. He noted that Attorney Krill has engaged in delay tactics throughout these proceedings. Attorney Krill also failed to cooperate with the OLR's investigation regarding the advance fee scheme matters. Attorney Krill lied to the circuit court and was jailed for contempt for failing to comply with the court's orders to return and account for client money.

¶53 The referee considered three cases involving conversion in which this court imposed an 18-month license suspension, albeit for conversion of lesser amounts or where mitigating circumstances were present. In re Disciplinary Proceedings Against Jelinske, 2018 WI 94, 383 Wis. 2d 604, 917 N.W.2d 542; In re Disciplinary Proceedings Against Voss, 2014 WI 75, 356 Wis. 2d 382, 850

21

N.W.2d 190; and In re Disciplinary Proceedings Against Meisel, 2017 WI 40, 374 Wis. 2d 655, 893 N.W.2d 558. Ultimately, the referee was persuaded to recommend a three-year suspension, imposed retroactive to the temporary license suspension.

¶54 After careful deliberation, we conclude that a three-year suspension, imposed retroactive to the temporary suspension, is insufficient in light of Attorney Krill's egregious misconduct. It is this court's responsibility to determine the appropriate discipline to be imposed for an attorney's misconduct. In making that determination, we are free to impose discipline more or less severe than that recommended by the referee. In re Disciplinary Proceedings Against Elliott, 133 Wis. 2d 110, 394 N.W.2d 313 (1986); In re Disciplinary Proceedings Against Reitz, 2005 WI 39, 279 Wis. 2d 550, 694 N.W.2d 894. In determining discipline we consider: (1) the seriousness, nature, and extent of the misconduct; (2) the level of discipline needed to protect the public, the courts, and the legal system from repetition of the attorney's misconduct; (3) the need to impress upon the attorney the seriousness of the misconduct; and (4) the need to deter other attorneys from committing similar misconduct. In re Disciplinary Proceedings Against Mulligan, 2015 WI 96, 365 Wis. 2d 43, 870 N.W.2d 233 (citations omitted).

¶55 We acknowledge the sanctions brief filed with the referee, in which the OLR provided case law in support of the recommended three-year suspension. See, e.g., In re Disciplinary Proceedings Against Gatzke, 2016 WI 37, 368 Wis. 2d 422, 878 N.W.2d 668 (imposing three-year suspension for misconduct

22

including the lawyer investing his client's funds in businesses where Attorney Gatzke was an investor when he did not first obtain the client's written consent, converting some of these funds, and then failing to account for the funds); In re Disciplinary Proceedings Against D'Arruda, 2015 WI 62, 362 Wis. 2d 760, 864 N.W.2d 873 (imposing three-year suspension for 42 counts of misconduct that affected 12 clients, that included violation of trust account rules, false statements to a tribunal, acts of dishonesty, and failure to cooperate with the OLR's investigation).

¶56 However, imposition of a retroactive three-year suspension would render Attorney Krill eligible to petition for reinstatement not long after the date of this order, an outcome the court finds untenable. Moreover, we consider the audacity and scope of the misconduct extremely troubling. We consider this case more akin to In re Disciplinary Proceedings Against George, 2008 WI 21, 308 Wis. 2d 50, 746 N.W.2d 236, where we suspended Attorney George following his conviction in federal court, on entry of a guilty plea, of one count of conspiracy to commit offenses against federal program funds in violation of 18 U.S.C. § 371 for his involvement in a plan in which he accepted "kickbacks" in exchange for exercising his political influence over federal grants as well as programs financed by state revenues. We have determined that a four and one-half year suspension is appropriate in this matter.

¶57 Consistent with our past practice we will make this suspension retroactive to the date we imposed a temporary

23

suspension based on our concern that the misconduct alleged posed a danger to the public. See In re Disciplinary Proceedings Against Knickmeier, 2004 WI 115, 275 Wis. 2d 69, 683 N.W.2d 445 (attorney's license revocation made effective as of the date of the court's order temporarily suspending respondent's license).

¶58 We emphasize that Attorney Krill will remained barred from practicing law in Wisconsin unless and until he proves his fitness in a formal reinstatement proceeding. Moreover, as a condition of any future reinstatement, Attorney Krill shall demonstrate that he has paid the $301,412.41 judgment he owes to the defendants in City of Racine v. AMSAH, LLC, Racine County Circuit Court, case no. 2015CV1289.[15]

¶59 We further agree that Attorney Krill should be ordered to pay restitution as stipulated by the parties and recommended by the referee: $17,500 to R.G. and $5,400 to J.S.[16]

---

[15] The referee and the OLR's sanction brief state an amount of $301.442.41. The complaint and the docket entries from the Racine County case reflect the amount of the judgment is $301,412.41. We use this figure. Neither the stipulation nor the referee specifically required Attorney Krill to satisfy the $48,000 judgment imposed for contempt sanctions as a condition to any future reinstatement. However, the question whether this judgment has been satisfied will be part of the standard reinstatement inquiry. SCR 22.29(4m).

[16] With respect to restitution, in its first complaint the OLR requested the court order Attorney Krill to pay $124,900 in restitution to D.R. The OLR later determined that these funds actually belonged to J.A., so it did not pursue this restitution request.

¶60 Finally, because this case presents no extraordinary circumstances and no objection to costs has been filed, we determine that Attorney Krill should be required to pay the full costs of this proceeding. See SCR 22.24(1m) (supreme court's general policy upon a finding of misconduct is to impose all costs upon the respondent attorney).

¶61 IT IS ORDERED that the license of Michael M. Krill to practice law in Wisconsin is suspended for a period of four and one-half years, commencing the date of his temporary license suspension, August 23, 2017.

¶62 IT IS FURTHER ORDERED that within 60 days of the date of this order, Michael M. Krill shall pay as restitution $17,500 to R.G. and $5,400 to J.S.

¶63 IT IS FURTHER ORDERED that as a condition of any future reinstatement, Michael M. Krill shall pay the $301,412.41 judgment

---

In its first amended complaint, the OLR added a request that this court award restitution to L.P. in the amount of $25,000. The OLR later determined that L.P. owed Attorney Krill attorney fees in excess of this amount. Accordingly, the OLR did not pursue this restitution request.

In its second amended complaint, the OLR requested the court direct Attorney Krill to reimburse the Fund for a payment of $147,000 made to J.A. The OLR later determined that it would not seek an order directing Attorney Krill to reimburse the Fund with respect to J.A. The OLR explains, in its restitution statement filed October 7, 2019, that it has determined that J.A. received more from the Fund ($124,000) than it could confirm Attorney Krill transferred from his trust account ($107,000). In addition, in a related matter, Attorney Krill surrendered his condominium to D.R., so the OLR has determined that Attorney Krill "gave up more in the matter than the $107,000 of [J.A.'s] funds actually in his trust account." We accede to the OLR's recommendation with respect to restitution in these client matters.

25

entered against him in favor of Z.H. and S.A. in City of Racine v. AMSAH, LLC, Racine County Circuit Court, case no. 2015CV1289.

¶64 IT IS FURTHER ORDERED that within 60 days of the date of this order, Michael M. Krill shall pay to the Office of Lawyer Regulation the full costs of this proceeding, which are $21,247.90 as of October 23, 2019.

¶65 IT IS FURTHER ORDERED that the restitution specified above and satisfaction of the judgment is to be completed prior to paying costs to the Office of Lawyer Regulation.

¶66 IT IS FURTHER ORDERED that Michael M. Krill shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶67 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.28(2).

26

1